Andrews, Ch. J.
The defendant was convicted at the court of general sessions of the city and county of New York ot the crime of murder in the first degree, in killing one Frank Paulsen on the evening of September 29, 1892.
The leading facts appearing in the evidence will be briefly stated. The deceased was a man fifty years of age, married, but living apart from his wife, and at the time of the homicide occupied a small hall bedroom in the third story of a house in Hester street, in the city of New York, one of a suite of five rooms rented by a Mr. Burns, who, with his wife, occupied the other rooms, and with whom the deceased had lived for about nine months preceding his death. Paulsen was an acquaintance of the defendant. He owned a watch and chain, and also a small watch, and this was known tortile defendant. The defendant Roehl was a Herman, about twenty-nine years of age, and about a month before the death of Paulsen had, upon his discharge from prison on the expiration of a sentence for petit larceny, gone to the house of an acquaintance, Mrs. Kattina, in Hoboken, and being out of employment, Roehl was permitted to remain in the house, paying nothing for his board, but assisting Mr. Kattina in securing drift wood and cutting it up and storing it in the cellar of the house. Roehl, before going to prison, had worked in a manufacturing establishment on Forty-eighth street, in the city of New York. *149 On the morning of September 29th, he left the house of Mrs. Kattina to go to the city for the purpose, as he stated, of getting employment in the establishment where he had formerly worked. Mrs. Kattina gave him two ferry tickets and a few cents in money. He appeared to be poor. He returned to Mrs. Kattina’s house about three or four o’clock on the same afternoon, and about five o’clock, after changing his clothes, started again for the city, Mrs. Kattina giving him ferry tickets and a little money as before.
About half-past six o’clock the same evening- a Mrs. Gould, who occupied the second story of the house on Hester street, while standing in the doorway of the door opening from her rooms into the hall, observed a man pass up the stairway leading to the third story of the house, and she subsequently identified the man as Eoehl. Mr. Burns also testified that at this time he was standing in the hallway in front of his rooms, waiting for his wife to return and open the door of his room, she having the key, and was amusing himself in playing with a dog, and that while so engaged a man, whom he also afterwards identified as Eoehl, came up the stairs and knocked at the door of Paulsen’s room, and that Paulsen, whose voice he identified, bade him “ come in.” Soon afterwards Mrs. Burns came in and she and her husband went into their rooms. After a time they heard the door of Paulsen’s room “ slammed ” aud the footsteps of a person going rapidly down stairs. Mrs. Gould’s attention was also attracted by the noise of a person going down the stairs, and she went to the window and saw Eoehl leaving the house, and he walked towards Grand street and then commenced running. Shortly after the man left the house Mr. and Mrs. Burns went from their rooms into the hallway and to the door of Paulsen’s bedroom, which was ajar, and opened it, and there saw Paulsen sitting in a chair with his head leaning to one side and covered with blood. Alarm was immediately given, and in a few minutes some policemen came and found Paulsen gasping, and he very soon died. The autopsy disclosed that his skull was cut and fractured in several places, as with a sharp instrument The brains of the deceased were exposed and blood was found spattered on the bed and on the wall near where he was sitting. There was no other disorder in the room or anything indicating, that there had been a struggle. Neither Mr. nor Mrs. Burns heard any noise in Paul-sen’s room while the man was there. Their rooms were adjoining his.
The evidence shows that between eight and ten o’clock the same evening Eoehl visited two saloons, where he ordered wine and beer, and exhibited several five dollar bills, and also silver money, and drank quite heavily. While in these saloons he also exhibited two watches (one with a heavy gold chain attached), which were afterwards identified by several witnesses as Paulsen’s. Later in the evening, Eoehl, on leaving one of the saloons, was arrested by a policeman as a suspicious person, and on his way to the station house with the officer he drew a small axe or hatchet, which apparently had been concealed by placing the handle in his trowsers behind and the blade under his vest, and attempted to strike *150 the officer. He was subdued and taken to the station house, and the watches were found on his person. The next morning he was taken to view the body of Paulsen, and there denied that he recognized the deceased, or that he had ever known a man by the name of Paulsen. He also claimed that the watches belonged to him, having bought one, as be said (naming the’ place where he obtained it), and the other he claimed, he procured in South America. The axe taken from him was stained with blood. Mrs. Kattina identified it as one that belonged to her, and she testified that it had been taken from her house without her knowledge or consent. Eoehl, on the trial, was sworn in his own behalf. He admitted the killing; that he was well acquainted with Paulsen ; that the watches were Paulsen’s, and that he had seen them in his possession before the day of the homicide.
The defense was that he had killed Paulsen in self defense. He stated that he took the axe from Mrs. Kattina’s with her knowledge, and for the purpose of getting it sharpened at the shop where he formerly had worked, and left her house with it at about five o’clock on the afternoon of September 29th, but that when he reached New York he thought it was too late for him to go to Forty-eighth street and get it sharpened that night; that he then thought he would go to Paulsen’s room and leave it there till morning, and went there for that purpose; that in the course of his conversation with Paulsen the latter made an insulting remark about Eoehl’s wife, which the latter resented, whereupon Paulsen sprang towards him, threw him upon the floor upon his back, placed his knee upon his body to hold him down and commenced choking him and saying: “ I’ll kill you, I’ll kill you;” that thereupon in the struggle his hand came upon the axe, which he had before placed by the stand, and he seized it and struck at Paulsen until he let go of him. Eoehl accounted for the possession of the watches by saying that Paulsen, soon after he went into the room, asked him to try to sell the watches for him, and gave them to him for that purpose. He accounts for the possession of the money by saying that it was part of some money he had before he went to prison, and that he brought it with him from Mrs. Kattina’s that day. It was shown by witnesses that he visited two saloons in the afternoon before the hour of the homicide and claimed to have no money, and obtained drinks without paying for them.
It is unnecessary to go into further detail of the facts. Hpon the People’s case there can be no doubt that this was an atrocious murder. The jury disbelieved the defendant’s story, as they had a right to do. It is not often that every element of murder in the first degree is so clearly established. Motive, deliberation, premeditation, intent to kill, are all present and are written in unmistakable characters in this fearful story.
There were no errors committed on the trial. The judge, in reciting to the jury in his charge the story of the defendant as to the struggle with Paulsen, said : “ Which, of course, is not gainsaid, and no one lives to gainsay it.” The remark was true and it was proper to call the attention of the jury to the fact *151 that the defendant’s story was uncorroborated and was incapable of corroboration, as one of the facts to be considered in determining the case.
It is claimed that the court erred in charging that there was “ ample evidence of premeditation and deliberation.” The judge did not so charge. He said it was so claimed on the part of the prosecution, and added: “ Of course, if the defendant had in mind, when he took the axe in hand, the killing of the deceased, and carried that design out, that is ample deliberation and premeditation.” The charge in this respect was free from objection. Whether the evidence made out a case of justifiable homicide was left to the jury under proper instructions.
One Unger was called by the People to identify the watches found on Roehl as the property of Paulsen, and was asked preliminarily as to his acquaintance with Paulsen, and whether Paul-sen and the witness belonged to the same post in the Grand Army of the Republic, and whether he served in the war with him in the same 'regiment. The evidence of the extent of the acquaintance between the witness and Paulsen was proper to be shown, as bearing upon the opportunities the witness had to become acquainted with Paulsen’s affairs, and that the jury might be able to give the proper weight to his testimony.
Some time subsequent to the trial an affidavit was filed in behalf of the defendant, which is annexed to the record, to the effect that the district attorney in his closing remarks to the jury referred to the deceased as “ a veteran in the late war who rendered meritorious service to the government, went to war, and would be the last man to call a woman a whore.” This language, if used, did not pass the proper limit of debate. The district attorney had a right to allude to any circumstance disclosed by the evidence which in his view rendered the story of the defendant improbable.
We have noticed all the points urged by the counsel for the reversal of the judgment. There is no error of law or fact disclosed by the record, nor is there any reason to doubt the justice of the conviction.
The judgment should be affirmed.
Judgment affirmed.
All concur.